IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JO NATALIE WILSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-12-1596 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION,[1] | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[2] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 11), Defendant's Motion for Summary Judgment (Document No. 12) and Plaintiff's Response to Defendant's Motion for Summary Judgment (Document No. 13). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 12) is GRANTED, Plaintiff's Motion for Summary Judgment

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is substituted for Michael J. Astrue as the defendant in this action.

[2] The parties consented to proceed before the undersigned Magistrate Judge on September 6, 2012. (Document No. 8).

(Document No.11) is DENIED, and the decision of the Commissioner is AFFIRMED.

## I. Introduction

Plaintiff, Jo Natalie Wilson ("Wilson"), brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). According to Wilson, substantial evidence does not support the Administrative Law Judge's ("ALJ")decision, and the ALJ, Allen G. Erickson, committed errors of law when he found that Wilson could perform her past relevant work as a home health care provider and was not disabled. Wilson argues that the ALJ erred in finding that her work as a home health care provider constituted substantial gainful activity. Wilson seeks an order remanding her claim for further proceedings. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Wilson was not disabled, that the decision comports with applicable law, and that it should, therefore, be affirmed.

## II. Administrative Proceedings

On April 20, 2009, Wilson applied for disability insurance benefits and supplemental security income benefits claiming that she had been unable to work since April 17, 2009 due to high blood pressure, thyroids, diabetes, and a seizures. (Tr. 191-207). The Social Security Administration denied her applications at the initial and reconsideration stages. (Tr. 97-104, 107-112). Wilson then requested a hearing before an ALJ. (Tr. 113-116). The Social Security Administration granted her request, and the ALJ held a hearing on September 16, 2010. (Tr. 29-92). On November 19, 2010, the ALJ issued his decision finding that Wilson not disabled. (Tr. 10-22).

Wilson sought review by the Appeals Council of the ALJ's adverse decision. The Appeals

Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence.  After considering Wilson's contentions, in light of the applicable regulations and evidence, the Appeals Council, on March 22, 2012, concluded that there was no basis upon which to grant Wilson's request for review. (Tr. 1-4).  The ALJ's findings and decision thus became final. Wilson has timely filed his appeal of the ALJ's decision.  42 U.S.C. § 405(g).  The Commissioner has filed a Motion for Summary Judgment (Document No. 12).  Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 11).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 458.  (Document No. 4).  There is no dispute as to the facts contained therein.


## III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits, is only: "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the

decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any

4

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and

laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3).  The impairment must be so severe as to

limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age,
> education, and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists in the
> immediate area in which [s]he lives, or whether a specific job vacancy exists for
> [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one

is suffering from a disability.  Rather, a claimant is disabled only if she is "incapable of engaging in

any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting

*Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1.  If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2.  If the claimant does not have a "severe" impairment or combination of
> impairments, [she] will not be found disabled;
>
> 3.  If the claimant has an impairment that meets or equals an impairment listed in
> Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
>
> 4.  If the claimant is capable of performing past relevant work, a finding of "not
> disabled" must be made; and
>
> 5.  If the claimant's impairment prevents [her] from doing any other substantial
> gainful activity, taking into consideration [her] age, education, past work experience,
> and residual functional capacity, [she] will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v.*

*Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *Id.* Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his November 19, 2010, decision, that Wilson was not disabled at step four because she retained the residual functional capacity to perform her past relevant work as a home health care provider as performed by her and that she therefore was not disabled within the meaning of the Act. In particular, the ALJ determined that Wilson was not presently working (step one); that Wilson's diabetes, hypertension, obesity, seizures, major depressive disorder and personality disorder were severe impairments, but that her conditions of gout, asthma, and thyroid problems were not severe impairments (step two); that Wilson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the Regulations (step three); that Wilson had the residual functional capacity to perform light work. The ALJ specifically determined that Wilson could climb stairs and ramps occasionally; balance, stoop, kneel, crouch, and crawl occasionally; and perform work that did not require climbing of ropes, ladders, or scaffolds or require exposure to hazards such as unprotected heights, open water, open flame, and dangerous moving machinery. The ALJ further found that Wilson could understand, remember, and carry out short simple instructions, perform routine, predictable tasks, make simple decisions, and perform work that required no more than

6

occasional contact with the general public and co-workers, and that Wilson could perform her past

relevant work as a home health provider as performed by her (step four).

## V. Discussion

### A. Objective Medical Evidence

The records show that Wilson has been treated for hypertension and diabetes. She also has

been treated for hypokalemia[3] or low potassium. Wilson is obese. Her height has been recorded as

five feet, one inch. She weighs around 254 pounds.

The earliest treatment record is dated October 26, 2007, from Acres Home Community

Health. Wilson complained of wrist pain. Her blood pressure was 140/98 and she weighed 254

pounds. Wilson reported that she had been compliant with taking her prescribed medications for high

blood pressure and type II diabetes. She was told to return in three months, or around January 26,

2007. (Tr. 384-389).

The next record is from January 2, 2008, when Wilson was treated by Dr. Olasupo

Olagundoye at Acres Community Health for a cough and fever.  She weighed 252 pounds and had

blood pressure reading of 160/100. (Tr. 364-367, 381-384).

On March 24, 2009, Wilson fainted outside of her apartment, and lost consciousness. She

was taken to Northwest Memorial Hermann Hospital. (Tr. 300-327). Upon arrival, Wilson's blood

pressure was 190/122. When discharged later that day, her blood pressure had come down to

---

[3] "Hypokalemia is abnormally low potassium concentration in the blood; it may result from excessive potassium loss by the renal or the gastrointestinal route, from decreased intake, or from transcellular shifts. It may be manifested clinically by neuromuscular disorders ranging from weakness to paralysis, by electro cardiographic abnormalities (depression of the T wave and elevating U wave), by renal disease, and by gastrointestinal disorders." *Dorland's Illustrated Medical Dictionary,* 32nd Edition (2012), p. 903.

2a0a4e2fe0688f8e

175/101. The results of an ECG were normal. (Tr. 209, 303, 321). A chest x-ray was normal.  (318, 319, 326, 327). An x-ray taken of Wilson's shoulder revealed degenerative osteoarthric changes of the glenohumeral joint and acromioclavicular joint and moderate marginal spurring was noted. (Tr. 320, 328).

Wilson had another "seizure" episode on April 19, 2009. A Harris County ambulance was dispatched to her apartment. (Tr. 329, 330, 331, 332). The EMS dispatch records show that Wilson's blood pressure was 222/136 when EMS arrived.  A later entry shows it came down to 195/113. Wilson reported she had taken all prescribed medications.  The EMS report states:

> Upon pt contact, pt was found sitting on her sofa and upset because she urinated on herself. Pt states "I told them I was fine." Pts family reports pt has had 2 full body seizures today, and both of them lasted for 15 seconds. Pts family states after both seizures the pt wants to go to bed and this last seizure she urinated on herself.  Pt reports she had her first seizure 3 weeks ago and was diagnosed with hypokalemia. Pt reports she is taking her medication like she is supposed to. Pt reports she has been feeling bad since Friday afternoon but did not want to worry her family. Pt reports her last oral intake was at 1300 today and she ate fried fish.  Pt reports she was nausated prior to calling EMS but took an antacid and it relieved her nausea. Pt reports dizziness when she stood up only. Pt denies any pain. Pt meds, hx and allergies as stated above. Head to toe assessment performed.  Cincinnati Stroke Scale performed and no deficits noted. Pt states she last took her BP medication an hour prior to EMS arrival. (Tr. 331).

Wilson was transported to Northwest Memorial Hermann Hospital  (Tr. 333-357). Wilson's blood pressure on arrival was 195/113 . On discharge, later that day, it was 158/67. A CT of her brain was normal. (Tr. 351, 357). Wilson's discharge diagnosis was seizure/hypokalemia.

Wilson was seen two days later, on April 21, 2009, at Acres Home Community Health. (Tr. 358-364, 373-379). She weighed 259 pounds and her blood pressure was 188/108. Wilson requested medication refills because she had just run out.  She stated she had been compliant with taking her prescribed medications. Her medications were refilled and she was instructed to return in two months

or around June 21, 2009. Wilson had an ultrasound of her abdomen taken on July 6, 2009. The radiologist noted that Wilson had a fatty infiltration of the liver and hepatomegely. (Tr. 379, 380). Wilson had an appointment at Acres Home Community Health on July 17, 2009. (Tr. 369-373). She weighed 270 pounds and her blood pressure was 160/100. Although Wilson reported that she had been taking her medications, she also stated she did not check her blood sugar or blood pressure at home. The note reflects that Wilson was instructed to return in four months, or around November 17, 2009.

Because Wilson alleged psychological impairments in her benefit applications, she was referred for an evaluation. That evaluation was performed on October 29, 2009, by Ross E. Keiser, Ph.D., a clinical psychologist. (Tr. 391-392). Dr. Keiser described Wilson as obese. With respect to Wilson's mental status evaluation, Dr. Keiser wrote:

> **Appearance, Behavior, and Speech**: Ms. Wilson was attired in casual clothing. She was neat and clean. She is obese. No abnormal movements or vocalizations were noted other than covering her face and crying at time. The claimant is pleasant, open, and cooperative. Her speech was clear and appropriate.
>
> **Thought Process**: Generally goal-directed. There was no evidence of looseness of associations, tangential, or circumstantial responding.
>
> **Thought Content**: She denies paranoia and delusions. She admits current suicidal thoughts but denies current intention.
>
> **Perceptual Abnormalities**: She denies any lifetime history of auditory or visual hallucinations other than talking to her late son and mother. She has vivid internal mental imagery of buildings burning and similar catastrophes.
>
> **Mood and Affect**: Ms. Wilson reports that her mood is depressed, and she has vegetative signs of depression. She has no energy, food has no taste, nothing is fun. Her affect was mildly labile.
>
> **Sensorium and Cognition:**

**Orientation**: Ms. Wilson was oriented to person, place, time, and situation.

**Memory**: Poor. Claimant could give only four digits forward. She knew the name of the president, but not the mayor or governor. She has no idea of current events as the family won't let her watch the news because it depresses her.

**Remote Memory**: Poor. Claimant was able to recall none of three items after delay. She could not state her social security number but knows her birth date. She does not know the names of former presidents.

**Concentration**: Poor. She is able to spell the word "world" forward but not backward. Serial 3's, "I can't do that." Simple calculations are done correctly.

**Abstract Thinking**: Poor. She interprets the proverbs and describes similarities very concretely.

**Insight and Judgment:** Level of insight into the nature of her psychological difficulties and treatment needs appears poor. She is preoccupied with her grief. Her level of judgment appears poor. Her responses to social paradoxes is poor, she would scream if she discovered a fire in the theatre, and would leave a found envelope.

**Fundamentals of Knowledge/Intellectual Functioning:** Intelligence was briefly assessed through a series of questions about everyday information. Nickels in two dollars: "I don't know." She did not know the governor of Texas, nor the mayor of Houston. States bordering Texas: "I don't know." and bursts into tears." Define 'sanctuary,' was met with sobbing. IQ estimate, average range.

**Summary:**
Claimant has many physical problems, and is depressed and histrionic. She has very little insight. (Tr. 394-395).

Based on his interview with Wilson and the results of the mental status evaluation, Dr. Keiser diagnosed Wilson with major depression and histrionic personality disorder. She had a GAF score of 50. Dr. Keiser opined that Wilson's prognosis was fair because she had never had psychological treatment and could improve with treatment. In addition, Dr. Keiser responded to specific issues the DDS requested be addressed in his evaluation of Wilson. His responses follow:

Claimant's ability to reason is significantly impaired due to her being histrionic and depressed.

Claimant's ability to make occupational adjustments is significantly impaired due to her being histrionic and depressed.

Claimant's ability to make personal adjustments is significantly impaired due to her being histrionic and depressed.

Claimant's ability to make social adjustments is significantly impaired due to her being histrionic and depressed.

Memory appears to be very impaired due to histrionic and depressive problems.

Concentration appears to be very poor for the above reasons. (Tr. 395-396).

A DDS physician, Richard Alexander, completed a Psychiatric Review Technique form (Tr. 397-410), and a Mental Residual Functional Capacity Assessment (Tr. 411-413) on November 17, 2009. Under "Paragraph A" of the Psychiatric Review Technique form, Dr. Alexander noted that Wilson has major depression, recurrent, without psychotic features, and a histrionic personality disorder. Next, Dr. Alexander considered Wilson's impairments in light of the "B" Criteria of the Listings. He noted that she had no episodes of decompensation. He opined that Wilson would have "mild" difficulties in maintaining social functioning, "moderate" difficulties in restriction of activities of daily living, and would have "marked" difficulties in maintaining concentration, persistence and pace. Wilson met no criteria under Paragraph "C".

On Wilson's Mental Residual Functional Capacity Assessment, Dr. Alexander evaluated four areas: understanding and memory, sustained concentration and persistence, social interaction, and adaptation. As to understanding and memory, Wilson was rated as "not significantly limited" in the ability to understand and remember very short and simple instructions, "moderately limited" in the ability to remember the locations and work-like procedure, and "markedly limited" in the ability to understand and remember detailed instructions. As to Wilson's abilities related to sustained

11

concentration and persistence, Dr. Alexander found that she was "not significantly limited" in the ability to carry out very short and simple instructions, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to sustain an ordinary routine without special supervision, and the ability to make simple work-related decisions. Dr. Alexander described Wilson as being "moderately limited" in several areas such as the ability to maintain attention and concentration for extended periods, the ability to work in coordination with or proximity to others without being distracted by them, the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Alexander found Wilson was "markedly limited" in one area, the ability to carry out detailed instructions. Next, Dr. Alexander assessed Wilson's mental functional capacity related to social interaction. Dr. Alexander found Wilson was "not significantly limited" in the ability to interact appropriately with the general public, the ability to ask simple questions or request assistance, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. He further described Wilson as being "moderately limited" in the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Lastly, Dr. Alexander evaluated Wilson's mental functional capacity as related to adaptation. He concluded that she was "not significantly limited" in the ability to be aware of normal hazards and take appropriate precautions, the ability to travel in unfamiliar places or use public transportation, and the ability to set realistic goals or make plans independently of others. He further found that she was "moderately limited" in the ability to respond appropriately to changes in the work setting. In sum, Dr. Alexander

found Wilson to be "markedly limited" in the ability to understand and remember detailed instructions, and the ability to carry out detailed instructions. In all other areas she had either no significant limitations or moderate limitations. Based on his assessment of Wilson, Dr. Alexander opined that she had the functional capacity to "understand, remember, and carry out only simply instructions, make simple decisions, attend and concentrate for extended periods. Interact adequately with co-workers and supervisors and respond appropriately to changes in routine work settings. (Tr. 413).

Also in connection with Wilson's benefits applications, a Physical Residual Functional Capacity Assessment was completed on November 18, 2009, by a DDS physician, Dr. Kelvin Samaratunga. (Tr. 415-422). With respect to exertional limitations, Dr. Samaratunga opined that Wilson could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about six hours in an eight hour workday, and had no limitations for push and/or pull. With respect to postural limitations, Wilson could frequently balance, stoop, kneel, crouch and crawl, and could occasionally climb ramp/stairs. Wilson could never climb ladders, ropes or scaffolds. Wilson had no manipulative, visual, or communicative limitations. Finally, as to environmental limitations, Dr. Samaratunga found that Wilson's physical residual functional capacity precluded her from even moderate exposure to hazards. In all other areas such as extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation, Wilson had no limitations.

Following the recommendation by Dr. Keiser that Wilson would benefit from specialized mental health treatment, medical records from Acres Home Community Health show that on April 19, 2010, she underwent a 30- minute psychiatric evaluation. The treatment note indicates she had

a GAF score of 60. She was diagnosed with moderate depressive disorder with anxiety. (Tr. 442-444). Other treatment notes from 2010 relate to Wilson's ongoing care for diabetes and hypertension. Wilson reported feeling well at her January 20, 2010, appointment. She weighed 272 pounds and her blood pressure was 170/100. Wilson was described as being "compliant most of the time" with her diabetes medication. (Tr. 450-458). Finally, at her March 3, 2010, appointment, Wilson weighed 272 pounds and her blood pressure was 170/90. Wilson's diabetes was described as poorly controlled, and she also needed improvement management of her blood pressure and hyperlipidemia. (Tr. 444-447).

The ALJ found that Wilson's impairments of diabetes mellitus, hypertension, obesity, seizures, major depressive disorder and personality disorder were severe impairments at step two, but that the impairments, individually or in combination did not meet or equal a relevant listing, and that she had the RFC to perform light work. In particular, that Wilson could climb stairs and ramps occasionally, balance, stoop, kneel, crouch, and crawl occasionally, and could perform work that does not require climbing of ropes, ladders or scaffolds or exposure to hazards such as unprotected heights, open water, open flame, and dangerous and moving machinery. Wilson could understand, remember, and carry out short simple instructions, perform routine, predictable tasks, make simple decisions, and perform work that requires no more than occasional contact with the general public and co-workers. The ALJ further found that Wilson's alleged impairments of gout, asthma, thyroid problems were not medically determinable impairments that would significantly limit Wilson's ability to do basic work activities.[4]   The step two requirement that the claimant have a severe

---

[4] The ability to do most work activities encompasses "the abilities and aptitudes necessary to do most jobs." *Williams v. Sullivan*, 960 F.2d 86, 88 (8th Cir. 1992). Examples include physical functions such as walking, sitting, standing, lifting, pushing, pulling, reaching, carrying,

impairment is generally considered to be "a de minimis screening device to dispose of groundless claims." *Smoven v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-154 (1987)). Simply put, "an impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984); 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

Here, substantial evidence supports the ALJ's determination that gout, asthma, and thyroid problems were not medically determinable impairments that could significantly impact her ability to do basic work activities. Absent in the medical records are indications of treatment for the above listed medical conditions, much less any indication they would or could impact her ability to do basic work activities.

Further, upon this record, substantial evidence supports the ALJ's step two and three determination that Wilson's diabetes, hypertension, obesity, seizures, major depressive disorder were severe impairments but that none, either singly or in combination, met a listing. The medical records show that Wilson's hypertension is amenable to medication. Absent from the medical records is any suggestion that any of Wilson's body system(s) have been affected as a result of high blood pressure. Similarly, Wilson's diabetes can be controlled through medication and there is no suggestion in any

---

or handling; capacities for seeing, hearing, and speaking; understanding, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work situation. *Id.* at 88-89; 20 C.F.R. § 1521(b).

of the medical records that diabetes has impacted any body system(s). Likewise, Wilson's "seizures" can be controlled by taking potassium and through her diet. As for Wilson's obesity, there is no indication in the medical records that it has affected or caused a disturbance of her musculoskeletal system. Wilson's mental impairments did not meet or equal Listings 12.04 and 12.08. Finally, substantial evidence supports the finding by the ALJ that she retained the RFC to perform light work. She had the RFC to climb stairs and ramps occasionally; balance, stoop, kneel, crouch, and crawl occasionally, and perform work that does not require climbing of ropes, ladders, or scaffolds or exposure to hazards such as unprotected heights, open water, open flame, and dangerous moving machinery. Wilson could understand, remember, and carry out short simple instructions, perform routine, predictable tasks, make simple decisions, and perform work that requires no more than occasional contact with the general public and co-workers. The ALJ's formulation of Wilson's RFC is consistent with the medical records, including the psychological evaluation of Dr. Keiser, the Mental Residual Functional Capacity and Psychiatric Review Technique form completed by Dr. Alexander, the Physical Residual Functional Capacity Assessment completed by Dr. Samaratunga, and her testimony concerning her daily activities and estimation of her functional abilities. The objective evidence factor weighs in favor of the ALJ's decision.

### B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical

16

opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995)). The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists. *Id.* "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez,* 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical opinions. Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)     the physician's length of treatment of the claimant,

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of record,

(5)     the consistency of the opinion with the record as a whole, and

(6)     the specialization of the treating physician.

*Newton*, 209 F.3d at 456. While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference. *Id.* Again, the Social Security Regulations provide guidance on this point. Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg. 34490 (July 2, 1996). With regard to the weight to be given "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 . . . providing appropriate explanations for accepting or rejecting such opinion." *Id.* The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R. § 404.1527(d). *Newton*, 209 F.2d at 456. "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so."). However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately. The ALJ

summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources.

With respect to the ALJ's consideration of the evidence, including the opinion evidence, he wrote:

> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.
>
> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)–i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques–that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.
>
> At the hearing, the claimant testified that despite her medications, she continues to have uncontrolled DM and HTN resulting in numbness in the hands and fingers as well as swelling of the feet. She has dizziness when her blood pressure is elevated. She has depression related to the death of her son in 2003 and the death of her mother. She is easily irritated and frequently stays withdrawn in her room because she does not like to be around others. She continues to have seizures and had an episode as recent as last month; however, she had not been hospitalized for a seizure since 2009. She started taking medications for depression in 2009 and they cause adverse side effects. She currently receives counseling with a mental health specialist at Acres Home and a counselor at church, but counseling has only provided minimal help. She has [difficulty] with concentration, but can follow her pastor's sermon at church. She has activities of daily living of waking up, saying her prayers, reading scriptures from the Bible, performing personal hygiene, preparing her daughter for

the school, taking her daughter to the bus stop, returning home to read more scriptures followed by watching television, eating a meal, picking her daughter up from the bus stop, and assisting her daughter with homework. She can drive, but her children drive her to places she needs to go because she has memory problems. Secondary to her physical symptoms including fatigue and cramping at the lower extremities, she has difficulty with lifting, walking, and standing.

Mr. Banks testified that he spends time with the claimant on a daily basis. He confirmed that the claimant has frequent crying episodes and spends much time alone in her room due to depression. He also testified that the claimant has memory problems that cause difficulty with driving as well as seizures that have caused her to lose urinary and bowel movement control. The claimant cannot drive and therefore he takes her to places such as the grocery store and church.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant asserts that she is disabled due to complications related to uncontrolled DM and HTN, i.e., numbness in the hands and fingers and swelling of the feet. DM and HTN are conditions that can be controlled with appropriate medication and treatment. The evidence, however, clearly shows that the claimant has had a history of not complying with prescribed treatment (Exhibits 6F/2-4, 7-8, 15F/21, 25-30). The regulations state that in order to be awarded benefits an individual must follow treatment prescribed by his/her physician if this treatment can restore the ability to work (20 CFR § 404.1530, 416.930, and SSR 82-59). Social Security Ruling 82-59, further states that when an individual does not follow prescribed treatment without a good reason a finding of not disabled will be made.

The claimant asserts that she is disabled due to longstanding depression. She has reported having depression since the death of her son 4 or 5 years prior to 2010 (Exhibit 7F), but did not seek treatment by a mental health specialist until April 2010. Prior thereto, she took medications, which were not prescribed by her primary care physician until the latter part of 2009 as she was not taking any medication for depression as of October 2009 when she underwent consultative psychological examination performed by Dr. Keiser (Exhibit 7F). She asserts debilitating limitations in her ability to concentrate and socialize due to depression, but her symptoms have improved with medication. This is evidenced by the fact that her assessed GAF score of 50 prior to taking prescribed medication. This is evidenced by the fact that her assessed GAF score of 50 prior to taking prescribed medication (Exhibit 7F) improved to 60 when medication for depression was initiated (Exhibit

15F/18-18).   Inconsistent with testimony at the hearing that she has minimal daily activities due to difficulties with concentration and social interaction, her Function Report dated June 2010 (Exhibit 4E) clearly shows that she socializes and has more activities of daily living than she alleges.   Moreover, her activities of daily living (Exhibit 4E) clearly show no more than moderate limitation in the area of concentration, i.e., she performs all aspects of personal hygiene, cleans, washes dishes, does laundry, irons, folds clothes, drives a car, shops for food, clothes, and household items, manages her finances, and is raising a young child. She socializes daily and goes to church regularly and, she enjoys reading, swimming and singing. The claimant has moderate limitation in her ability to concentrate and interact with others; therefore, her mental residual functional capacity is limited to understanding and carrying out simple instructions, performing routine predictable tasks, making simple decisions, and interacting with the general public and co-workers on no more than an occasional basis.

The claimant also asserts that she cannot work due to seizures. The claimant has reported having seizures (Exhibits 1F, 2F) and has had one syncopal episode; however, there is no definite diagnosis of a seizure in the record (Exhibit 10F/6) and CT scan of the brain dated April 2009 revealed normal findings (Exhibit 3F/23). The evidence does not show follow up treatment for seizures and she does not take any medication for a seizure disorder (Exhibit 13F). Despite minimal objective findings of a seizure disorder, the claimant is given the benefit of the doubt that she has had seizure like episodes. As such, her residual functional capacity includes seizure precautions against climbing of ladders, ropes, and scaffolds and exposure to hazards such as unprotected heights, open water, open flame, and dangerous moving machinery.

As for the opinion evidence, the undersigned affords great weight to the opinions of the State agency medical and psychological consultants, and all of the evidence of record considered as a whole, the undersigned concludes that the claimant has the residual functional capacity to perform light work with non-exertional limitations as described herein. (Tr. 20-21).

Here, the undersigned Magistrate Judge finds that the ALJ's decision is a fair summary and characterization of the medical records. The Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's

testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render her disabled.  *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders,* 914 F.2d at 618-19 (citing *Harrell v. Bowen,* 862 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala,* 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames,* 707 F.2d at 166.

Wilson and her son testified at the hearing.  Wilson testified she was given the wrong medication.  She testified she was supposed to have been given a potassium pill and without it, she started having seizures when her potassium levels dropped. (Tr. 44).  Wilson testified that she has diabetes and high blood pressure, which are both uncontrolled.  This causes her hands and fingers to go numb, she feels fatigued, is shaky, irritable, and has dry mouth. (Tr. 45).  According to Wilson, she has these symptoms even when she takes her prescribed medication. (Tr. 46).  Wilson stated that her seizures are controlled with potassium. (Tr. 48).  Wilson testified she was born with asthma and

had an attack several years ago. She also has gout in her ankles and knees. (Tr. 57).   Wilson also complained of hand pain. (Tr. 63). Wilson stated she has been compliant with taking her medications. According to Wilson, "get my medicine, take my medicine." (Tr. 47).

Wilson testified that she has been depressed since her son was killed in 2003 and a short time later both her mother and great grandmother died. (Tr. 47). Wilson has been getting treatment for depression. (Tr. 51-52, 74-75). According to Wilson, the medicine she has been prescribed calms her down. (Tr. 52, 54).

Wilson also testified about her daily activities. According to Wilson, she does not do much of anything. (Tr. 58, 68). Most of her time is spent in her bedroom. Her son brings her food to her. (Tr. 70).   She leaves the apartment to take her "baby" to school. She rides with her sister to the bus stop to drop off the child and goes back to pick up her niece's daughter, age nine. (Tr. 60). She watches TV. (Tr. 48, 58, 60, 68). Wilson attends church twice a week.  (Tr. 54). She lives with her children in an apartment.

Wilson was questioned by the ALJ about her functional limitations. She testified that she walks and then rests. She estimated she could stand for ten minutes. (Tr. 65-66). Wilson stated that if she sits for too long she gets leg cramps. (Tr. 66-67).   Wilson testified she is no longer able to braid hair. (Tr. 67). Her hands and feet swell because of her high blood pressure. (Tr. 71). Wilson testified that she cannot bend and pick up objects, or squat. (Tr. 72).   She reported being dizzy all the time. (Tr. 73).

Wilson's son, James P. Banks, testified at the hearing. Mr. Banks testified that he visits his mother on a daily basis. (Tr. 76). He described Wilson as being depressed. (Tr. 78). He stated that Wilson spends most of her time in her room secluded from others. (Tr. 78, 83). Mr. Banks testified

that his mother is forgetful and often forgets to take her medicine or is unable to recall if she took it. (Tr. 81-82). Mr. Banks also testified about Wilson's functional limitations. He estimated that Wilson could walk for five or ten minutes but would then need to take a break and that she could not climb stairs. He also stated his mother has poor grip strength and drops things. (Tr. 83-84).

Based on the reasons which follow, the ALJ rejected Wilson's testimony as not fully credible. The ALJ wrote:

> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)–i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques–that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.
>
> At the hearing, the claimant testified that despite her medications, she continues to have uncontrolled DM and HTN resulting in numbness in the hands and fingers as well as swelling of the feet. She has dizziness when her blood pressure is elevated. She has depression related to the death of her son in 2003 and the death of her mother. She is easily irritated and frequently stays withdrawn in her room because she does not like to be around others. She continues to have seizures and had an episode as recent as last month; however, she had not been hospitalized for a seizure since 2009. She started taking medications for depression in 2009 and they cause adverse side effects. She currently receives counseling with a mental health specialist at Acres Home and a counselor at church, but counseling has only provided minimal help. She has [difficulty] with concentration, but can follow her pastor's sermon at church. She has activities of daily living of waking up, saying her prayers, reading scriptures from the Bible, performing personal hygiene, preparing her daughter for the school, taking her daughter to the bus stop, returning home to read more scriptures followed by watching television, eating a meal, picking her daughter up from the bus stop, and assisting her daughter with homework. She can drive, but her

children drive her to places she needs to go because she has memory problems. Secondary to her physical symptoms including fatigue and cramping at the lower extremities, she has difficulty with lifting, walking, and standing.

Mr. Banks testified that he spends time with the claimant on a daily basis. He confirmed that the claimant has frequent crying episodes and spends much time alone in her room due to depression. He also testified that the claimant has memory problems that cause difficulty with driving as well as seizures that have caused her to lose urinary and bowel movement control. The claimant cannot drive and therefore he takes her to places such as the grocery store and church.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
The claimant asserts that she is disabled due to complications related to uncontrolled DM and HTN, i.e., numbness in the hands and fingers and swelling of the feet. DM and HTN are conditions that can be controlled with appropriate medication and treatment. The evidence, however, clearly shows that the claimant has had a history of not complying with prescribed treatment (Exhibits 6F/2-4, 7-8, 15F/21, 25-30). The regulations state that in order to be awarded benefits an individual must follow treatment prescribed by his/her physician if this treatment can restore the ability to work (20 CFR § 404.1530, 416.930, and SSR 82-59). Social Security Ruling 82-59, further states that when an individual does not follow prescribed treatment without a good reason a finding of not disabled will be made.

The claimant asserts that she is disabled due to longstanding depression. She has reported having depression since the death of her son 4 or 5 years prior to 2010 (Exhibit 7F), but did not seek treatment by a mental health specialist until April 2010. Prior thereto, she took medications, which were not prescribed by her primary care physician until the latter part of 2009 as she was not taking any medication for depression as of October 2009 when she underwent consultative psychological examination performed by Dr. Keiser (Exhibit 7F). She asserts debilitating limitations in her ability to concentrate and socialize due to depression, but her symptoms have improved with medication. This is evidenced by the fact that her assessed GAF score of 50 prior to taking prescribed medication. This is evidenced by the fact that her assessed GAF score of 50 prior to taking prescribed medication (Exhibit 7F) improved to 60 when medication for depression was initiated (Exhibit 15F/18-18).   Inconsistent with testimony at the hearing that she has minimal daily activities due to difficulties with concentration and social interaction, her Function Report dated June 2010 (Exhibit 4E) clearly shows that she socializes and has more activities of daily living than she alleges.  Moreover, her activities of daily living

(Exhibit 4E) clearly show no more than moderate limitation in the area of concentration, i.e., she performs all aspects of personal hygiene, cleans, washes dishes, does laundry, irons, folds clothes, drives a car, shops for food, clothes, and household items, manages her finances, and is raising a young child. She socializes daily and goes to church regularly and, she enjoys reading, swimming and singing. The claimant has moderate limitation in her ability to concentrate and interact with others; therefore, her mental residual functional capacity is limited to understanding and carrying out simple instructions, performing routine predictable tasks, making simple decisions, and interacting with the general public and co-workers on no more than an occasional basis.

The claimant also asserts that she cannot work due to seizures. The claimant has reported having seizures (Exhibits 1F, 2F) and has had one syncopal episode; however, there is no definite diagnosis of a seizure in the record (Exhibit 10F/6) and CT scan of the brain dated April 2009 revealed normal findings (Exhibit 3F/23). The evidence does not show follow up treatment for seizures and she does not take any medication for a seizure disorder (Exhibit 13F). Despite minimal objective findings of a seizure disorder, the claimant is given the benefit of the doubt that she has had seizure like episodes. As such, her residual functional capacity includes seizure precautions against climbing of ladders, ropes, and scaffolds and exposure to hazards such as unprotected heights, open water, open flame, and dangerous moving machinery. (Tr. 19-20).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. The ALJ noted inconsistencies between Wilson's testimony and her responses contained in the Function Report dated June 2010 concerning concentration and social interaction. Accordingly, this factor also supports the ALJ's decision.

### D. Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial

gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Herman Litt, a vocational expert ("VE"), at the hearing. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling,* 36 F.3d at  436.

The ALJ posed the following hypothetical questions to the VE:

Q. Mr. Lipp, I've already had you certified earlier. And so I think we're ready to dive right into this. I've got a hypothetical here for you; assume that Ms. Wilson has the ability to do a light level of work; no climbing of ladders, ropes, scaffolds; only occasionally climbing of stairs and ramps; only occasional on all the other postural's, balancing, stooping, kneeling, crouching, crawling; no exposure to hazards such as open water, open flame, open machinery et cetera; she can understand, remember and carry out short, simple instructions. She can perform only routine predictable tasks; she can make simple decisions and should have only occasional contact with the general public and coworkers. Would she be able to perform her past relevant work as I've found it which was either the home health care provider or the fast food worker?

A. The home health care provider your honor would be something that, as she performed it, would be in contact with that one individual that she was caring for. That would be the only issue there, otherwise the hypothetical fits with what she

indicated she was doing.

Q. How about fast food worker, obviously I believe that would be precluded because of the contact problems correct?

A. Yes. That would not work, that would not work.

Q. But at light with this hypothetical, in your professional opinion, she could do the home health care provider, is that correct?

A. As she performed it but not as typically done.

Q. As it was actually performed by her, is that correct?

A. Yes, as she indicated.

Q. Okay. Now let's go down to light. I mean I should say sedentary is what I meant to say. Obviously I believe that would preclude all past relevant work is that correct?

A. That's correct.

Q. Everything else remaining the same, and then we're at sedentary and assuming – let's put it this way.   Assume a person of Ms. Wilson's age of 50, she has a high school education, past relevant work experience that is all unskilled and then she'd be able to perform the sedentary work with all the other previous limitations indicated. Are there occupations in the national or regional economy such a person could perform?

A. There would be some unskilled jobs with the hypothetical your honor.

Q. Give me three representations thereof.

A. Okay, there would be jobs such as optical goods worker, DOT 713.684-038 approximately 3,000 in the state; 135,000 nationally. Jewelry preparer; DOT 700.687-062 about 4,000 in the state, 130,000 nationally.
                                         *                               *

A. and then sorter.
                          *                          *

Q. There are all sedentary unskilled?

A. Sedentary unskilled your honor.

*                    *

Q. All right, now let me add some other factors here on either one of these RFC's what would be the impact? This person would miss three or more work days per work month?

A. Would not be able to maintain employment.

Q. Okay, would fail to concentrate 25 percent or more on any task at hand?

A. Still not be able to maintain employment.

Q. And if this person would require two or more additional work breaks, in addition to what is normally allowed, and the duration of each of which would be 10 or 15 minutes or more, would that be consistent with full time employment?

A. No, sir. (Tr. 85-88).

Based on Wilson's RFC, and the testimony of the VE that Wilson could perform her past relevant work as a home health care provider as she performed it, the ALJ found at step four that Wilson was not disabled. Wilson argues that the ALJ's step four finding is not supported by substantial evidence because Wilson's "past relevant work" as a home health care provider was part-time work and was not performed at the substantial gainful activity level.  According to Wilson, the record shows that she only earned seventy-two dollars per week, which would equate to approximately $3,744.00 per year or $312.00 per month, as a home health care provider. (Tr. 253). Wilson points to her Work History Report that the ALJ specifically relied on, that states she was paid $6.00 per hour, four hours a day, three days a week. In addition, Wilson points out the hearing transcript wherein the ALJ recognized that he did not have a detailed earnings record or "Full DIB Review Sheet", which lists a claimant's detailed earnings history for the past fifteen years. The form identifies the employer and breaks down the year by quarter. In support of her arguments, Wilson points to the following observation by the ALJ about his not having a detailed earnings record:

29

Q. What I'm doing right, but the way, I'm looking at the earnings to confirm what I discovered. By the way, for the record, '05 itself is not an excess of SGA levels; only about $8,000 as you testified however my guess is that whatever you were doing you worked into 2005. And that's why sometimes just the earnings level at first glance don't necessarily jive. But in '02 excess, '03 excess, '04 excess, '05 it dipped down but I guess you probably worked until sometime during that year and stopped. So again, '02– and ordinarily my staff attaches a document we call a detailed earnings query and they did not here. So this is going to be like pulling teeth. Let's do our best with this, I usually have something that I can zero in on that sometimes even shows the quarter. So again, let's go back. Do you recall working at Jack in the Box in 2002? (Tr. 38).

According to Wilson, because her work as a home health care provider never approached the Commissioner's Substantial Gainful Activity figures for the 2000 through 2003 time frame, it follows she could not perform her past relevant work, and therefore the ALJ's step four determination is not supported by substantial evidence and the matter be remanded for an evaluation at step five to ascertain whether there are jobs that Wilson can perform in light of her RFC, age, education and work history.

At step four of the sequential evaluation process, an ALJ must determine whether a claimant such as Wilson has the capacity to perform her past relevant work. Is the claimant can perform their past relevant work, then the claimant is not disabled.

A job may be considered past relevant work only if it involved "substantial gainful activity." 20 C.F.R. § 404.1565(a). "Past relevant work is work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it." 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). To determine whether past work is substantial gainful activity, the earnings derived from the work are considered. 20 C.F.R. § 404.1574(a)(1) and 416.974(a)(1). There is a rebuttable presumption the employee was or was not engaged in substantial gainful activity if the employee's average monthly earnings are above or below a certain amount

established by the Commissioner's Earnings Guidelines. 20 C.F.R. §§ 404.1574(B)(2)-(3) & 416.974(B)(2)-(3); http://www.ssa.gov/oact/cola/sga.html. For the years in question, 2000-2003, Wilson's prior work would be presumed substantial gainful activity if she earned $700 per month in 2000, $740 per month in 2001, $780 a month for 2002, and $800 a month for 2003. In addition to earnings, the Commissioner may consider other factors to determine whether a claimant's past job is substantial gainful activity such as whether there is other evidence that shows the claimant was engaged at substantial gainful activity or the claimant was in a position to control the amount of wages paid. In that situation, the Commissioner may consider whether the work performed is "comparable to that of unimpaired people in [the employee's] community who are doing the same or similar occupations taking into account the time, energy, skill, and responsibility involved in the work. 20 C.F.R. § 404.1574(b)(3)(ii)(A) & 416.974(b)(3)(ii)(A). In addition, the Commissioner may rely on evidence that the employee's work is worth more than the substantial gainful activity amounts set forth in the Commissioner's Earning Guidelines for that year. 20 C.F.R. §404.1574(b)(3)(ii)(B) &416.974(b)(3)(ii)(B).

In the instant action, from 2000 to 2003, Wilson was employed as a home health care provider.  The ALJ's step four determination that Wilson was not disabled was based on his conclusion that Wilson's prior work as a home health care provider constituted substantial gainful activity performed within the past fifteen years, was past relevant work, and that she retained the RFC to perform that work in the manner she performed the work.

Wilson argues that her income for the years 2000 through 2003 was too low to qualify as substantial gainful activity. According to Wilson, the only evidence of her income absent a detailed earnings record is her Work History Report, wherein she stated she earned $72 a week, or $312 a

month, or $3,744 a year. Wilson argues that $312 a month falls far short of the Commissioner's Earnings Guidelines for 2000 through 2003, which ranged from $700 per month in 2000 to $800 a month in 2003.

Since the ALJ did not have a DIB Review sheet, he relied on the Certified Earnings Record, Wilson's Work History Report, and the testimony of the VE and Wilson. The ALJ established a chronological time line of Wilson's employment. The following exchanges between the ALJ, Wilson and the VE follows:

Q. Congratulations welcome to the club. The 50 and over club; I'm not sure it's great to be in it but we're in it so. Anyway, now I also need to discuss with you one last area of preliminaries. Part of my job Ms. Wilson is to ascertain your past relevant work. And to do that I have to look at a time frame going back 15 years from today's date, so September 16, 1995 to now. And I look at years in which you had what we call significant gainful activity. Now how is that set? Well, it's set by social security; each of those years social security has set a particular level of earning. Generally speaking, again, if you're less than that it is not. Now, it can occasionally be a little more complicated than that but that's generally the case. So what I've looked at; I've examined all your earnings over these years and I've zeroed in on a few years which you were indeed apparently were in — at least the levels earnings at first glance are in excess of the said earnings, in other words they're SGA. And that's '02, '03, '04, '05, and '08. So let's discuss—what I want to discuss with you Ms. Wilson is what were you doing work wise in that time frame. Now you provided some information to social security already and we appreciate that. But it's not very clear, first of all most of the years are years that I'm not concerned about. You didn't have an excess of significant gainful activity, I'm talking about '96, '99, 2000. I'm looking at a cover sheet my staff prepares for me, I didn't do this all myself. So all that's not credible but the years that you seemed to have covered from 2000 and 2009 you indicate you were a cashier in retail and fast food?

A. Yes, sir.

Q. So I would gather from that that in '02, '03, '04, '05 that's what you were doing, is that correct or were you doing something else?

A. No. A period of time I was not working.

Q. This is in a period of time when you were. I don't ---

32

A. I was working at Jack in the Box.

Q. Okay.

A. Yeah, at fast food. And home health care.

Q. What establishments did you work at?

A. Jack in the Box, and home [health] care.

Q. All right, let's take them each at a time. When did you work at Jack in the Box? To the best of your recollection, I know this is difficult.

A. It was like in '08. And '07.

Q. What I'm doing right, but the way, I'm looking at the earnings to confirm what I discovered. By the way, for the record, '05 itself is not an excess of SGA levels; only about $8,000 as you testified however my guess is that whatever you were doing you worked into 2005. And that's why sometimes just the earnings level at first glance don't necessarily jive. But in '02 excess, '03 excess, '04 excess, '05 it dipped down but I guess you probably worked until sometime during that year and stopped. So again, '02– and ordinarily my staff attaches a document we call a detailed earnings query and they did not here. So this is going to be like pulling teeth. Let's do our best with this, I usually have something that I can zero in on that sometimes even shows the quarter. So again, let's go back. Do you recall working at Jack in the Box in 2002?

A. In 2002 I was not working at a Jack in the Box. I was working at Wal-Mart, I think it was Wal-Mart, I worked at Wal-Mart up to 2005.

Q. Okay, so Wal-Mart was '02 all the way through '05?

A. Yes.

Q. So that's what you remember is you worked there for a number of years, is that correct?

A. Yes.

Q. Mr. Lipp does that jive with what you see there?

VE: No, sir. Not exactly.

ALJ: Why not? First off let me get you certified. Mr. Merick are you familiar with Mr. Lipp at all?

Atty: I'm very familiar.

ALJ: You'll stipulate to his qualification?

Atty: Yes, sir.

Examination of Vocational Expert by ALJ

Q. Mr. Lipp are you familiar with personally or professionally with Ms. Wilson?

A. No, your honor.

Q. And have you discussed the case with myself, Mr. Merick, or Ms. Wilson?

A. No, sir.

Q. Okay, I do certify you as a vocational expert. What are you seeing?

A. Well I'll just read you— we show lows from '99 to 2000 in the record. Then I think it says from '00 to '03, home health care provider.

Q. What exhibit are you looking at?

Atty: 6E.

A. It's in E, yeah.

Q. Let me go to that. Often times I don't have to consult that but his is one of the rare occasions that I do. So let me get on the same page, hang on a second.

A. Yeah.

Q. Work history back ground.

CLMT: '05 Wal-mart.

Q. All right, we've got lows which is not in the relevant time frame. This says --

A. Lows in '99 to 2000.

Q. Right that is not in the relevant time frame. I mean that is not significant earnings.

A. Oh, okay I got you.

Q. I'm looking at '02, '03, '04, '05 and '05, now it makes sense to me about what she's saying about '05.

A. Yeah, Wal-Mart.

Q. She didn't get employed until later. All right this indicates, maybe we can prompt you and help your memory here Ms. Wilson.

Examination of Claimant by ALJ

Q. What you provided to social security, again my cover sheet wasn't full but this actually is. This shows that from May of 2000 to about October or I should say August of '03 you were a home health care provider, does that sound right?

A. In '03, yeah.

Q. So you worked at that in '02 and '03?

A. Yes.

Q. All right, now we're getting down to [inaudible]. Okay, home health care provider, it was in excess of SGA. We'll find that that was the first episode of past relevant work. I believe that is what? Medium semi skilled?

VE: It is your honor. If the person is certified for sure. I don't know if she's certified.

Q. Were you certified?

A. For home health care? Yeah I worked with but I can't think of the name through, for home health care.

Q. So you know what we mean by certified?

VE: Certified nurse's assistant?

A. Oh no, I wasn't a nurse's assistant. I was like a caretaker, like a provider you know.

VE: Okay, it's unskilled your honor.

35

Q. Is it still called home health care provider?

VE: Yes, unskilled and she indicates in the record it was done at the light exertional level even though it's typically medium.

Q. So it's generally performed at medium but she performed it at light?

VE: That's what she indicated.

Q. Hold on a minute. Okay, again, I'll find that as the first episode of past relevant work. And then into '04 that now gets us into apparently Jack in the Box. Does that sound right, Ms. Wilson? September '03 to '04? You indicated Jack in the Box, is that correct?

A. Yes.

Q. All right, I'll find that as a second episode of past relevant work. Fast food worker is what I believe we have called that in the past?

VE: Yes, sir.

Q. I believe that was also either medium or light?

VE: Light and unskilled.

Q. I sense a theme here. All right, light and unskilled fast food worker. And finally, yes, there was a period in '04 to '05 where you were indeed apparently unemployed is that correct?

A. Yes, sir.

Q. And left Jack in the Box and didn't work for a while?

A. Yes, sir.

Q. You started at Wal-Mart— well the Wal-Mart job must have been very much part time, is that correct? Because in that time frame the earnings were not very good?

A. At the Wal-Mart job?

Q. You worked primarily '06– actually yeah let's see here. Yeah, you worked there primarily '05 and '06, at Wal-Mart, is that correct?

A. Yes.

Q. And your earnings were not significant at that time, I won't find that . But then it picked up back in '08, you went back to Jack in the Box?

A. Yes, sir.

Q. You did the same thing, fast food worker?

A. Mm–Hmm.

Q. All right, I will find two episodes of past relevant work. That you for your patience with this Ms. Wilson but we have to nail this down to be able to analyze your situation. Home health care provider I will find as an episode of past relevant work; actually light unskilled, generally medium unskilled. Fast food worker, she performed it as it is generally performed, correct? Light unskilled?

VE: Yes. (Tr. 36-43).

Based on this testimony, along with Wilson's Work History Report, and Certified Earnings Record (Tr. 212-213), the ALJ established a time line of Wilson's employment. While not broken down by employer or quarters, the Certified Earnings Record set forth Wilson's covered earnings in a given year. For instance, Wilson's Certified Earnings Record shows she had yearly earnings of $384.38 in 2000, yearly earnings of $3,462.22 in 2001, yearly earnings of $9,209.29 in 2002, and yearly earnings of $12,788.28 in 2003. (Tr. 213).   This breaks down to $32.03 a month for 2000, $288.51 a month for 2001, $767.44 a month for 2002, and $1,065.69 for 2003.  Based on this, Wilson's monthly earnings for 2000, 2001 and 2002, were too low to qualify as substantial gainful activity. Her monthly income for 2003 did qualify as substantial gainful activity. To the extent the ALJ relied on years 2000, 2001, and 2002, the error in harmless because Wilson met the income level for 2003. While it would have been helpful for the ALJ to have the DIB Review Sheet as argued by Wilson, the transcript of the administrative hearing shows the ALJ was aware it was

missing and relied on the Certified Earnings Record, Work History Report, and testimony from Wilson and the Vocational Expert to make his determination. Upon this record, substantial evidence supports the ALJ's step four determination that Wilson could perform her past relevant work as a home health care provider as performed and was not disabled within the meaning of the Act. [5]

## V. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Wilson was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No. 11), is DENIED, Defendant's Motion for Summary Judgment (Document No. 12) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

---

[5] The instant action is distinguishable from *Grant v. Shalala*, No. 93-8324, 1994 WL 487172 (5th Cir. Aug. 15 1994). In *Grant*, the Fifth Circuit Court of Appeals applied the average monthly earnings presumption to decide whether a claimant's part-time work as a crossing guard qualified as substantial gainful activity. The only evidence concerning the claimant's salary was the claimant's statements in a vocational report she had submitted in connection with her application for benefits. The Fifth Circuit found that based on the claimant's statements about her earnings which showed that claimant's earnings were less than the earning level required by the regulations, the matter was remanded. Unlike *Grant*, the ALJ relied on a Certified Earnings Record as well as statements made at the administrative hearing, and determined that her income was not too low to qualify as substantial gainful activity.

Signed at Houston, Texas, this _17th_ day of July _____, 2013

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE